# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MIDDLEGATE DEVELOPMENT, LLP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 10-0565-WS-C** |
| | ) | |
| **HOWARD BEEDE,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter comes before the Court on defendant Central Illinois Land Title Company's Motion for Summary Judgment (doc. 25), defendants Howard and Nancy Beede's Motion for Summary Judgment (doc. 28), and Motions to Strike (docs. 32, 35) filed by both Central Illinois and the Beedes. All of these Motions have been briefed and are ripe for disposition.

I.      **Nature of the Case.**

This action, like so many that have occupied courts throughout the Gulf Coast region in recent years, arises from a beach condominium deal gone sour. The agreed-upon sales transaction never closed, leaving buyer and sellers to quarrel over their respective rights and obligations, including the proper ownership of considerable amassed escrowed funds. Here, the escrow agent disbursed the funds to the sellers pursuant to a forfeiture clause in the contract. As a reward for this decision, the escrow agent was sued by the buyer too. In an atypical wrinkle, the sellers have brought counterclaims against the buyer, alleging that the buyer razed the subject condominium unit before the purchase was consummated, then backed out of the deal, leaving the sellers with no condo and no sales proceeds.

## II.    Relevant Facts.[1]

The underlying material facts in this dispute are straightforward and largely undisputed. At all relevant times, defendants Howard and Nancy Beede were the owners in fee simple of Unit A-206 (the "Unit") of the Beach House Condominium complex in Gulf Shores, Alabama. In late 2004, plaintiff, Middlegate Development, LLP, negotiated an agreement with the Beedes to purchase the Unit for $525,231.00.[2]  Middlegate's then-counsel drafted a purchase agreement (the "Purchase Agreement") outlining the terms of the sale.  (Doc. 25, Exh. D, Answer to Interrog. #4; Doc. 25, Exh. B, ¶ 4.)

The first several paragraphs of the Purchase Agreement enumerated various acknowledgments by the parties.[3]  In Paragraph 1, Middlegate and the Beedes "acknowledge that the proposed redevelopment of the property contemplates demolition and removal of the existing improvements."  (Doc. 25, Exh. A, ¶ 1.)  Paragraph 4 states that "[t]he parties acknowledge that closing of the sale of Seller's Unit will be held once construction financing has been obtained by [Casa Del Mar, the developer] for the proposed new development, and a sufficient number of Units have been pre-sold … so that [Casa Del Mar] and the construction lender approve the

---

[1]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party, resolving all reasonable doubts about the facts in favor of the non-movant.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, as to both pending Motions for Summary Judgment, plaintiff's evidence is taken as true and all justifiable inferences from the record are drawn in its favor.

[2]    As memorialized in the ensuing written Purchase Agreement, Middlegate's purchase of the Beedes' unit was part of a larger planned redevelopment of the complex, which was to be completed by a non-party developer named Casa Del Mar Development, LLC.  The relationship (if any) between Casa Del Mar and Middlegate is not fleshed out in the record; however, they are distinct entities.  Indeed, the Purchase Agreement sets forth Middlegate's and the Beedes' clear acknowledgment that Casa Del Mar was not a party to that agreement.  (Doc. 25, Exh. A, ¶ 12.)

[3]    These acknowledgments appear to be more in the vein of substantive/operative clauses than mere recitals.  Even if they were recitals, however, they may be enforceable under applicable law.  *See generally City of Birmingham v. I.E. Morris & Associates*, 54 So.2d 555, 558 (Ala. 1951) ("Recitals in a contract should be reconciled with the operative clauses, and given effect, so far as possible; but where the recital is so inconsistent with the covenant or promise that they cannot be harmonized, the latter, if unambiguous, prevails.") (citation omitted).

closing." (*Id.*, ¶ 4.) And in Paragraph 5, Middlegate and the Beedes "acknowledge that Beach House Condominium was damaged during Hurricane Ivan" and that "Buyer agrees to purchase Seller's Unit 'As Is.'" (*Id.*, ¶ 5.)

In addition to those acknowledgements, the Purchase Agreement drafted by Middlegate set forth the following substantive terms of the transaction: (i) Middlegate had the right to cancel on or before December 15, 2004, in which case the agreement would be null and void; (ii) Middlegate was to pay $5,000 toward the purchase price as earnest money with the execution of the agreement; (iii) the earnest money was to be held in trust by defendant Central Illinois Title Company "subject to the terms and conditions of this Agreement"; (iv) if Middlegate elected not to void the agreement by December 15, 2004, "the earnest money shall be paid to [the Beedes] by [Central Illinois] and shall be non-refundable"; (v) the balance of $520,231 was due at closing; (vi) closing was to "take place on or before June 30, 2005, and no later than the closing of the construction financing by [Casa Del Mar] for the redevelopment project"; and (vii) if the closing did not occur on or before June 30, 2005, "then, at the option of the [Beedes], this Agreement may be cancelled by [the Beedes], and there will be no further obligations between the parties hereunder." (*Id.*, ¶¶ 3, 6-8, 11.) The Beedes and Middlegate executed the Agreement in November 2004.[4]

Middlegate did not exercise its right to cancel the Purchase Agreement by December 15, 2004; therefore, by the plain language of that Agreement, the $5,000 earnest money paid by Middlegate now belongs to the Beedes.[5] Just two days before the June 30, 2005 closing deadline

---

[4]     There is neither evidence nor allegation that Middlegate and/or the Beedes entered into any separate agreement with Central Illinois, or that there was any written contract between either of them and Central Illinois delineating the latter's escrow obligations. Rather, the Purchase Agreement and its amendments appear to be the only documents setting forth Central Illinois' duties with regard to escrowed funds deposited by Middlegate. The absence of a separate formal escrow contract is not dispositive of Central Illinois' legal obligations. *See, e.g., In re Hilson*, 863 N.E.2d 483, 492 (Mass. 2007) ("An escrow agreement consists of the delivery of money or other valuable object by one party and a promise by the other to hold it until the performance of a condition or the happening of a certain event. … There need not be an express writing signed by the parties.").

[5]     Middlegate conceded as much in written discovery responses, where it stated, "We contend the Beedes are entitled to keep the $5,000.00 earnest money per paragraphs 3, 6 and 7 of the Purchase Agreement." (Doc. 25, Exh. D, Answer to Interrog. #19.)

established in the Purchase Agreement, the parties agreed to extend that deadline via amendment, which was memorialized in writing.  (Doc. 25, Exh. C.)  The amendment reflected that the parties had agreed to postpone the closing "from June 30, 2005 until October 30, 2005 for the consideration of an additional $10,400 to the purchase price payable in 4 monthly installments" by Middlegate.  (Doc. 28, Exh. A.)[6]

During the next 20 months, there followed a series of four more amendments to the Purchase Agreement, each sequentially extending the closing date for the Unit in exchange for further consideration being paid/deposited by Middlegate.  (Doc. 25, Exh. B, ¶ 5.)  Middlegate's counsel drafted all of these written amendments.  (Doc. 25, Exh. D, Answer to Interrog. #5; doc. 25, Exh. B, ¶ 4.)  Each of the Second through the Fifth Amendments followed a similar format, to-wit: (i) the parties agreed to extend the closing deadline for a fixed additional period of time; (ii) in consideration for the Beedes agreeing to delay the closing, Middlegate agreed to make certain additional payments (with some of them designated as being made toward the existing purchase price and others specified as being additional to the purchase price), with such funds payable to Central Illinois as escrow agent; (iii) language that if Middlegate did not close on or before the specified date, "the money held in escrow at Central Illinois Land Title shall be forfeited to the Sellers, Nancy and Howard Beede"; and (iv) a statement that "[a]ll other provisions of the purchase agreement shall remain the same."  (Doc. 25, Exh. C.)

Pursuant to these five amendments to the Purchase Agreement, Middlegate deposited a grand total of $175,746.56 in payments (over and above the initial $5,000 earnest money deposit from November 2004) with Central Illinois between July 23, 2005 and February 5, 2007.  (Doc. 25, Exh. B, ¶ 5 & Exh. A.)  Central Illinois held all such funds subject to the terms and conditions of Middlegate's agreement with the Beedes.  (Doc. 25, Exh. B., ¶ 4.)  By the express terms of the amendments, Middlegate and the Beedes designated $125,000 of those funds as

---

[6]    Certain copies of the June 28 amendment in the court file are not executed by Middlegate; however, there appears to be no dispute that this amendment was, in fact, duly executed and binding on all parties.  The same is true of the subsequent written amendments found in the record.  Certainly, there is no allegation and no evidence that any of these written addenda to the Purchase Agreement are fraudulent, unexecuted, or otherwise do not accurately embody the terms of the various iterations of the parties' agreement as circumstances unfolded. As such, the Court will treat these amendments as having been signed and binding on the parties, notwithstanding the absence of fully executed copies of some of them in the court file.

going toward the original purchase price, with the remaining $50,746.56 being added to that original purchase price.[7]

Although it is unnecessary to recite the contents of each amendment in detail (given that they all follow the above general format), the Fifth Amendment to the Purchase Agreement is of central importance to this case. In that early 2007 amendment, Middlegate and the Beedes agreed "to further extend the closing of Unit A-206 … from June 30, 2005 until no later than December 31, 2007, for the consideration of $1976.15 payable monthly as part of the purchase price, retroactive to November 1, 2006 until unit is closed or December 31, 2007, which ever is sooner, payable to the Central Illinois Title Company by Buyer." (Doc. 25, Exh. C.) The Fifth Amendment further specified as follows: "In the event the Buyer does not close on or before December 31, 2007, the money held in escrow at Central Illinois Land Title shall be forfeited to the Sellers, Nancy and Howard Beede." (*Id.*) Finally, the document stated that "[a]ll other provisions of the purchase agreement shall remain the same." (*Id.*) The Beedes executed the Fifth Amendment on January 19, 2007, with Middlegate signing it on February 6, 2007.[8]

Middlegate did not satisfy its obligations under the Fifth Amendment. In fact, the only funds that Middlegate transmitted to Central Illinois pursuant to that agreement were a single payment of $3,952.29 (equaling two months' worth of agreed-upon installments) on February 5, 2007. (Doc. 25, Exh. B, ¶ 6.) Middlegate made no further monthly payments to Central Illinois,

---

[7]     Put another way, by the terms of the amendments, the purchase price that Middlegate agreed to pay for the Unit increased from $525,231.00 to at least $575,977.56 (the original purchase price plus the funds actually paid by Middlegate as additions to the purchase price). Given that Central Illinois was holding $180,746.56 in escrow as of February 2007, Middlegate remained responsible for paying an additional $395,231 in principal at the closing, had it ever occurred.

[8]     The Fifth Amendment specified the full measure of payments that Middlegate owed the Beedes as of December 31, 2007 as consisting of $395,231.70 (the total unpaid principal amount), plus the 14 monthly payments of $1,976.15, plus an additional lump-sum payment of $7,598 at closing. (Doc. 25, Exh. C.) Thus, by the terms of the Fifth Amendment, the total amount due and owing from Middlegate to the Beedes (in addition to the funds already held by Central Illinois) to consummate the sale of the Unit was $430,495.80 ($395,231.70 + $27,666.10 ($1,976.15 x 14) + $7,598.00).

despite promising to do so in the Fifth Amendment. (*Id.*)[9] Likewise, Middlegate never closed on the Unit, either before or after December 31, 2007. No subsequent amendments to the Purchase Agreement were negotiated or agreed upon by Middlegate and the Beedes.

The record reflects that, on an unspecified date after February 5, 2007, Central Illinois released the escrowed funds to the Beedes. (Doc. 25, Exh. B, ¶ 7.) Thus, Central Illinois turned over to the Beedes the entire $180,746.56 paid into escrow by Middlegate pursuant to the Purchase Agreement and its various amendments.[10]

---

[9]     For purposes of calculating the total amount owed by Middlegate to the Beedes, then, Middlegate was entitled to a credit of $3,952.29 for the February 5 payment, but remained contractually obligated to pay, on or before December 31, 2007, the sum of $426,543.51 (or $430,495.80 - $3,952.29). Thus, the total outstanding balance owed by Middlegate to close on the Unit as of December 31, 2007 was $426,543.51.

[10]     To elaborate on these events, Middlegate offers the Affidavit of Paul Stewart (doc. 30-1). Stewart, a partner at Middlegate, avers that prior to December 31, 2007, Middlegate demanded that Central Illinois return all escrowed funds to it and that, also prior to December 31, 2007, Central Illinois notified Middlegate that the funds were released to the Beedes. (Doc. 30-1, at ¶¶ 22, 24.) Defendants have challenged and moved to strike this portion of the Stewart Affidavit for lack of personal knowledge of those communications between Central Illinois and Middlegate representatives. (*See* docs. 32, 33, 35.) To support this assertion, defendants point to Middlegate discovery responses (signed by Stewart on Middlegate's behalf) identifying only persons other than Stewart as having communicated with Central Illinois concerning the status and release of escrowed funds. (Doc. 25, Exh. D, Answer to Interrogs. # 6, 8, 15.)

        Defendants' objection is well-founded. Affidavits submitted in support of or opposition to a motion for summary judgment "must be made on personal knowledge" and "set out facts that would be admissible in evidence." Rule 56(c)(4), Fed.R.Civ.P.; *see also Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1382 (Fed. Cir. 2010) (reciting requirement that affidavits "in opposition to summary judgment must be made with personal knowledge"). The Stewart Affidavit improperly relays the substance of communications in which Stewart admittedly did not participate and about which he has only second-hand information; therefore, the "personal knowledge" requirement is violated. It is no answer to suggest, as Middlegate does, that this defect may be overcome through inclusion of a "to the best of my knowledge and belief" caveat in the Affidavit. *See, e.g., Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("statements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact"); *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) ("an affidavit stating only that the affiant believes a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact" and "a statement that the affiant believes something is not in accordance with the Rule"). Accordingly, the Motions to Strike are **granted** insofar as they relate to statements in paragraphs 22 and 24 of the Stewart Affidavit recounting the substance of communications in which Stewart (Continued)

Ultimately, Middlegate filed suit against the Beedes and Central Illinois concerning the funds paid into escrow pursuant to the Purchase Agreement and its various amendments.  In particular, Middlegate brought claims against Central Illinois for professional negligence, wantonness and breach of fiduciary duty (all predicated on the theory that Central Illinois wrongfully released the escrowed funds to the Beedes with neither notice to Middlegate nor the legal right to disburse the money in that manner); against the Beedes for conversion (rooted in the theory that the Beedes wrongfully took possession of funds belonging to Middlegate); and against all defendants for declaratory judgment, breach of contract and conspiracy.  (*See* doc. 1.)  For their part, the Beedes interposed counterclaims against Middlegate sounding in declaratory judgment, specific performance, intentional trespass, and conversion.  (*See* doc. 14, at 5.)  The Beedes' claims stem from allegations that Middlegate demolished the condominium unit without closing the sale and without any ownership interest in the property, thereby "leaving the Beedes in a position where they received only a portion of the money due them for the purchase of their Unit, yet were left with no Unit which they can use."  (*Id.*, ¶ 59.)  The Beedes want, *inter alia*, a money judgment against Middlegate for the full balance owed on the purportedly now-nonexistent Unit.

The Motions for Summary Judgment filed separately by Central Illinois and by the Beedes touch upon all of these claims and counterclaims.

**III.    Summary Judgment Standard.**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden

_____

did not participate.  Those statements are **stricken** as violative of Rule 56(c)(4)'s "personal knowledge" requirement.

of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## IV. Analysis.

Because the two pending Rule 56 Motions are conceptually distinct, the Court will address each of them separately.

### A. Central Illinois' Motion for Summary Judgment.

Central Illinois' legal position is quite straightforward, to-wit: All it did was follow express instructions in the Purchase Agreement and its various amendments, so it cannot be liable to Middlegate, as a matter of law.

Under well-settled Alabama law (which both Central Illinois and Middlegate invoke in their memoranda), "An escrow agent is generally considered to be the agent of both parties to an escrow agreement. Such an agent is akin to a special agent and is limited in its liability to the proper performance of those duties and obligations specifically delineated in the escrow agreement for the achievement of a specific goal." *Fisher v. Comer Plantation, Inc.*, 772 So.2d 455, 468 (Ala. 2000) (quoting *Gurley v. Bank of Huntersville*, 349 So.2d 43, 45 (Ala. 1977)).[11]

_____

[11] *See generally The Florida Bar v. Hines*, 39 So.3d 1196, 1200 (Fla. 2010) ("absent an express agreement, the law implies from the circumstances that an escrow agent undertakes a legal obligation … to exercise reasonable skill and ordinary diligence in holding and delivering possession of the escrowed property … in strict accordance with the principals' agreement") (citations and internal quotation marks omitted); *Babcock Place L.P. v. Berg, Lilly, Andriolo & Tollefsen, P.C.*, 69 P.3d 1145, 1151 (Mont. 2003) ("the duty of an escrow agent is narrowly defined by law," and agent "is bound to comply only with the instructions of the parties to the escrow agreement and may not exceed this authority") (citation omitted); *American State Bank v. Adkins*, 458 N.W.2d 807, 810 (S.D. 1990) ("It is generally accepted that an escrow agent is the agent and fiduciary of all parties to an escrow agreement" and is obligated "to act in strict accordance with the terms of the escrow agreement") (citations omitted); *Lewis v. Shawnee State* (Continued)

Indeed, the Alabama Supreme Court has unequivocally explained that "[t]he escrow instructions constitute the full measure of the agent's obligations." *Fisher*, 772 So.2d at 468 (quoting *Gurley*, 349 So.2d at 45).

Central Illinois correctly maintains that its instructions were clear. By the plain language of the Fifth Amendment, "In the event the Buyer does not close on or before December 31, 2007, ***the money held in escrow at Central Illinois Land Title shall be forfeited to the Sellers***, Nancy and Howard Beede." (Doc. 25, Exh. C (emphasis added).) Thus, Middlegate and the Beedes instructed Central Illinois that "the money held in escrow" (which could only be referring to the $180,746.56 that Middlegate had deposited with Central Illinois) was to be "forfeited" to the Beedes if Middlegate failed to close by the end of 2007. In fact, Middlegate did not close the sale of the Unit on or before that deadline, so Central Illinois (acting in strict accordance with those instructions) disbursed the escrowed funds to the Beedes. Central Illinois now argues that it is entitled to summary judgment on all of Middlegate's claims (including those for professional negligence, wantonness, breach of fiduciary duty, breach of contract, and conspiracy), on the ground that there is no genuine dispute of material fact that in releasing escrowed funds to the Beedes, Central Illinois was complying strictly with its instructions in the operative agreement, such that it has no liability to Middlegate under Alabama law.

In opposition to Central Illinois' Rule 56 Motion, plaintiff articulates three arguments. First, Middlegate suggests that the operative instruction is found in Paragraph 4 of the original Purchase Agreement. Recall that Paragraph 4 included a blanket statement that "[t]he parties acknowledge that closing of the sale of Seller's Unit will be held once construction financing has been obtained … and a sufficient number of Units have been pre-sold." (Doc. 25, Exh. A, ¶ 4.) But Paragraph 4 says nothing about the fate of any escrowed funds. It certainly does not direct Central Illinois to hold those monies in escrow until Casa Del Mar obtains construction financing. By contrast, the Fifth Amendment drafted by Middlegate and executed by the parties in early 2007 is clear and unambiguous that if the closing did not occur by a date certain

_____

*Bank of Shawnee*, 596 P.2d 116, 120 (Kan. 1979) (escrow agent "must be guided in carrying out its duty by what the contract says, for the agreement for escrow with its instructions constitutes the full measure of the duties and obligations assumed by the depository. The parties cannot expect more.").

(December 31, 2007), the escrowed funds held by Central Illinois would be forfeited to the Beedes. The "acknowledgment" in Paragraph 4 of the original agreement cannot reasonably be read as modifying, negating or superseding the crystal clear forfeiture language set forth in the Fifth Amendment. Nor is there any conflict between the two provisions. The language to which the parties agreed in the Fifth Amendment prescribed an absolute deadline for forfeiture of escrow proceeds unless closing occurred in the interim. By contrast, Paragraph 4 merely recited in "acknowledgment" form the general concept as to when closing would occur, without saying anything about whether and when escrowed funds might be forfeited. As a hornbook rule of contract construction, specific provisions in a contract prevail over their more general counterparts.[12]

Had Middlegate intended for the Beedes' forfeiture rights to be pegged to some date or event (*i.e.*, Middlegate's failure to close upon Casa Del Mar's obtaining redevelopment financing) other than the December 31, 2007 deadline, the Fifth Amendment could and would have been drafted to specify that other trigger. It was not. As it stands, the plain language of that agreement confers upon the Beedes an absolute right to the accrued escrow funds if Middlegate failed to close by December 31, 2007. Middlegate cannot now inject contract terms that are not there, or change the bargain it struck simply because it regrets that agreement. Rather, it is bound by the clear and plain terms of its agreements, including the forfeiture provision. *See, e.g., Lemoine Co. of Alabama, LLC v. HLH Constructors, Inc.*, 62 So.3d 1020, 1026 (Ala. 2010) ("When a court construes a contract, the clear and plain meaning of the terms of the contract are to be given effect, and the parties are presumed to have intended what the terms clearly state.") (citations omitted).[13] This Court "may not make a new contract for the

---

[12] *See, e.g., Bradford v. KFC Nat'l Management Co.*, 5 F. Supp.2d 1311 (M.D. Ala. 1998) (citing "basic principle of contract law that when general [provisions] in a contract are qualified by the specific provisions, the rule of construction is that the specific provisions in the agreement control") (citation and internal quotation marks omitted); *Ward v. Check Into Cash of Alabama, LLC*, 981 So.2d 434, 438 (Ala.Civ.App. 2007) ("One rule of contract construction holds that a specific provision prevails over a general provision relating to the same subject matter.").

[13] *See also Chris Myers Pontiac-GMC, Inc. v. Perot*, 991 So.2d 1281, 1284 (Ala. 2008) ("a court should give the terms of the contract their clear and plain meaning and should presume that the parties intended to do what the terms of the agreement clearly state") (citation omitted); *Harbison v. Strickland*, 900 So.2d 385, 391 (Ala. 2004) ("it is elementary that it is the (Continued)

parties or rewrite their contract under the guise of construing it." *Public Bldg. Authority of City of Huntsville v. St. Paul Fire and Marine Ins. Co.*, --- So.3d ----, 2010 WL 3937962, *8 (Ala. Oct. 8, 2010) (citations omitted); *see also Title Max of Birmingham, Inc. v. Edwards*, 973 So.2d 1050, 1055 n.1 (Ala. 2007) ("It is not a function of the courts to make new contracts for the parties, or raise doubts where none exist.") (citations omitted).

Middlegate's second argument against Central Illinois' Rule 56 motion is that the escrow agent should not have taken it upon itself to decide which party was entitled to the $175,746.56 in disputed escrowed funds, but instead "should have interplead the money into the Court and let the Court determine who was entitled to have received what." (Doc. 30, at 8.) Middlegate cites neither facts nor legal authority in support of its assertion that Central Illinois was obliged to interplead the funds rather than disbursing them to the Beedes as the plain contractual language directed. Certainly, the Court is aware of no provision of Alabama law – and Middlegate has cited none – imposing a legal duty on escrow agents to initiate judicial interpleader proceedings whenever buyer and seller disagree as to entitlement to the funds.[14] In the absence of any identified extrinsic statutory or regulatory requirement, Central Illinois' duties to Middlegate and

---

terms of the written contract, not the mental operations of one of the parties, that control its interpretation") (citation omitted).

[14] At best, Middlegate points to the Affidavit of Paul Stewart, one of Middlegate's principals, in which he states that "Central Illinois Land Title in my opinion have wrongfully refused to return Middlegate's $175,746.50" and that "Central Illinois … breach[ed] its fiduciary duties to Middlegate by releasing Middlegate's money to the Beedes without Middlegate's written permission or court order." (Stewart Aff. (doc. 30-1), ¶¶ 23, 25.) An interested witness's conclusory opinion about what is or is not "wrongful" and what does or does not constitute a "breach of fiduciary duties" is of no moment for summary judgment purposes. *See, e.g., Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law."); *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So.2d 839, 852 (Ala. 2002) ("Generally, a witness, whether expert or lay, cannot give an opinion that constitutes a legal conclusion or amounts to the application of a legal definition."); Rule 56(c)(4), Fed.R.Civ.P. (affidavits or declarations supporting or opposing summary judgment motions must "set out facts that would be admissible in evidence"). Central Illinois having properly objected on these grounds, the Stewart Affidavit is **stricken** insofar as it purports to state his legal and moral opinions about the propriety of Central Illinois' conduct. The Motions to Strike (docs. 32, 35) are **granted** as to Stewart's averments that Central Illinois behaved "wrongfully" and "breach[ed] its fiduciary duties to Middlegate."

the Beedes were confined to those established by contract. *See Fisher*, 772 So.2d at 468 ("[t]he escrow instructions constitute the full measure of the agent's obligations").  To be sure, the parties (especially Middlegate, the drafter) could have spelled out detailed instructions in an escrow agreement, requiring Central Illinois to interplead the funds in the event of a dispute between Middlegate and the Beedes as to the disposition of the funds.[15]  But no such instructions exist here.  Instead, the parties agreed to a provision stating in the clearest of terms that "the money held in escrow at Central Illinois Land Title shall be forfeited" to the Beedes if Middlegate failed to close on or before December 31, 2007.  Thus, Central Illinois' clear instructions were to disburse the escrowed funds to the Beedes – not to interplead them – if Middlegate did not close by the end of 2007.  Central Illinois having adhered to these instructions, Middlegate's insistence that it should have commenced an interpleader action instead is a nonstarter.

Third, Middlegate advances a half-hearted argument that Central Illinois' disbursement of the escrow funds violated the Alabama Real Estate Commission Administrative Code.  In so doing, Middlegate relies on the following regulation:  "If for any reason the transaction is not consummated, or if for any reason there is a disagreement involving to whom trust funds should be disbursed, the qualifying broker shall not disburse any trust funds except pursuant to a written agreement signed by all parties or pursuant to a court order." Ala. Admin. Code § 790-X-3-.03(5).  Although this section lends superficial plausibility to Middlegate's position, plaintiff's argument collapses for the threshold reason that § 790-X-3-.03(5) is inapplicable here.  On its face, the cited provision applies only to "qualifying brokers."  Middlegate advances no argument that Central Illinois is a "qualifying broker" within the meaning of that regulation.  Moreover, the Alabama Real Estate License Law of 1951, which these regulations implement, defines a "broker" as "[a]ny person licensed as a real estate broker" under Alabama law.  Ala. Code § 34-27-2(a)(2).  There is no evidence that Central Illinois is a licensed real estate broker in Alabama

---

[15]     *Compare Scheer Homes, Inc. v. Hills*, 3 So.3d 887, 888 (Ala.Civ.App. 2008) (involving real estate transaction where purchase agreement included directives to escrow agent that if either buyer or seller claimed escrowed funds without agreement of the other party, the escrow agent could, at its option, retain the escrowed funds pending a written mutual release among the parties, interplead the escrowed funds into a court, or deliver the funds to the party it believed in good faith was entitled to them).

or anywhere else, much less that it needed to be in order to perform routine escrow services on a real estate transaction in Alabama.[16]  Because Central Illinois was not bound by the Alabama Real Estate Commission Administrative Code, Middlegate cannot impute a legal obligation to that entity from the Administrative Code to interplead the escrowed funds in lieu of following the instructions set forth in the Fifth Amendment.

For all of these reasons, Middlegate's claims against Central Illinois for professional negligence, wantonness, breach of fiduciary duty, declaratory judgment, breach of contract, and conspiracy fail as a matter of law.  In disbursing the escrowed funds to the Beedes, Central Illinois was adhering to express instructions delineated in the relevant contract, which provided that if Middlegate did not close by December 31, 2007, the escrowed funds held by Central Illinois were forfeited to the Beedes.  The summary judgment record unambiguously establishes that the Central Illinois' release of escrowed funds to the Beedes was in fulfillment of its contractual obligations, pursuant to agreements prepared by Middlegate.  Had Middlegate wished to establish a mechanism through which Central Illinois must interplead or hold funds in the event of disagreement between Middlegate and the Beedes as to the funds' disposition, it could have engrafted such a feature onto the relevant contracts.  Middlegate having chosen not to do so, this Court is not empowered to rewrite those agreements to include such provisions today. Accordingly, Central Illinois' Motion for Summary Judgment (doc. 25) is **granted**, and all claims brought against it by Middlegate are **dismissed with prejudice**.  The Clerk's Office is **directed** to terminate Central Illinois as a party to this action.

### B.  *The Beedes' Motion for Summary Judgment.*

In their Rule 56 Motion, the Beedes move for judgment as a matter of law not only as to Middlegate's claims against them, but also as to the Beedes' counterclaims against Middlegate.

---

[16]    On the latter point, the relevant statute provides that an Alabama real estate license is necessary to perform any of the following services: (i) buy, sell, rent or lease real estate in Alabama; (ii) offer to buy, sell, rent or lease real estate in Alabama; (iii) negotiate or attempt to negotiate the listing, sale or lease of real estate in Alabama; (iv) list real estate for sale or lease in Alabama; (v) auction real estate in Alabama; (vi) deal in options on real estate in Alabama; (vii) aid in locating or obtaining real estate for purchase or lease in Alabama; (viii) procure prospects for the sale or lease of real estate in Alabama; (ix) procure properties for purpose of effecting sale or lease of real estate in Alabama; or (x) present one's self as being able to perform acts for which licensure is required.  *See* Ala. Code § 34-27-30.  The record is devoid of evidence that Central Illinois did any of these with regard to the Middlegate/Beede transaction.

Because the analysis for these two sets of summary judgment requests is distinct, the Court will treat each prong of the Motion separately.

*1. Middlegate's Claims against the Beedes.*

As previously indicated, Middlegate's claims against the Beedes sound in state-law theories of conversion, declaratory judgment, breach of contract and conspiracy. The reasoning animating all of these causes of action is the same, to-wit: The Beedes wrongfully took possession of $175,746.56 in escrowed funds belonging to Middlegate, without contractual basis or legal authorization. To combat this theory of liability, the Beedes rely on the straightforward premise that they were entitled to those funds as a matter of law, such that all of Middlegate's claims must fail because the Beedes' possession of the subject funds is entirely proper and in accordance with the parties' bargain.

As explained *supra* in discussion of the Rule 56 Motion filed by Central Illinois, the parties had expressly agreed via the Fifth Amendment that all escrowed funds would be forfeited to the Beedes if Middlegate failed to close by December 31, 2007. It is undisputed that Middlegate never closed by that deadline (or ever, for that matter). It is further undisputed that the parties entered into no subsequent agreements to give Middlegate relief from the stringent, unambiguous forfeiture clause contained in the Fifth Amendment. Simply put, the parties agreed to a specific, date-certain deadline by which Middlegate must close or else forfeit the money held in escrow. Inasmuch as Middlegate failed to comply with that deadline, the escrowed funds were properly forfeited to the Beedes in furtherance of the plain language of their agreement. There are no genuine issues of material fact here. The forfeiture of the escrowed funds to the Beedes, and the Beedes' acceptance of same, was precisely in accordance with the terms of the written agreement. Because all of Middlegate's claims against the Beedes are predicated on the legally and factually unsupportable notion that the Beedes had no right to the escrowed funds, the Beedes are entitled to summary judgment on those claims.

Middlegate's only argument to the contrary turns on Paragraph 4 of the original Purchase Agreement, to-wit: Middlegate's contention that the funds should have remained in escrow because of the parties' acknowledgment back in November 2004 that "closing of the sale of Seller's Unit will be held once construction financing has been obtained … and a sufficient number of Units have been pre-sold." (Doc. 25, Exh. A, ¶ 4.) The Court has already determined that this general acknowledgment in the original agreement in no way trumps, modifies, or calls

into question the clear forfeiture provision set forth in the Fifth Amendment.[17]  No purpose would be served by reiterating that analysis here; however, one additional aspect of Middlegate's position warrants discussion.  In particular, Middlegate characterizes Paragraph 4 as setting forth a condition precedent (*i.e.*, the developer obtaining construction financing) to the closing.  Because that condition precedent was never satisfied, Middlegate reasons, performance of the contract was impossible.[18]

To the extent that Middlegate frames its argument as an "impossibility" defense, that contention is unavailing as a matter of law.  The Alabama Supreme Court "has not recognized the defense of impossibility or impracticability."  *Silverman v. Charmac, Inc.*, 414 So.2d 892, 894 (Ala. 1982); *City of Gulf Shores v. Harbert Int'l*, 608 So.2d 348, 352 (Ala. 1992) ("we have repeatedly rejected the impossibility defense").  The reason is simple:  When a party undertakes an absolute obligation to perform, its subsequent breach should not be excused by obstacles or hardships because the party could have anticipated and contracted for those contingencies in the contract.[19]  Middlegate has proffered no authority for the proposition that Alabama courts might recognize an impossibility defense in the circumstances presented here, and the above decisions undermine any such contention.  Thus, insofar as Middlegate seeks relief from the agreement on grounds of impossibility, that defense cannot ward off the Beedes' Rule 56 Motion.

Middlegate has alternatively postured this argument (*i.e.*, that it could not close because the developer never obtained financing for the redevelopment project) as failure of a condition

---

[17]    To accept Middlegate's position affording primacy to Paragraph 4 would be to construe a distinct forfeiture provision out of the agreement altogether.  Courts are loath to interpret specific contract terms as mere surplusage, particularly where they do not conflict with other provisions.

[18]    Middlegate couches this argument in the following terms:  "Clearly [Paragraph 4 contains] a condition precedent necessary for a closing to take place on the subject unit which has not and can not [*sic*] be met.  As such, the contract between the parties is impossible to perform as a result of the developer's decision not to go forward with the construction of the proposed development."  (Doc. 30, at 7.)

[19]    As the Alabama Supreme Court has said, "Where one by his contract undertakes an obligation which is absolute, he is required to perform within the terms of the contract or answer in damages, despite an act of God, unexpected difficulty, or hardship, because these contingencies could have been provided against by his contract."  *Silverman*, 414 So.2d at 894 (citations omitted).

precedent. Unlike impossibility, this defense is recognized by Alabama courts. *See Duncan v. Auto-Owners Ins. Co.*, 592 So.2d 568, 571 (Ala. 1992) ("a party can question the whole existence of a contract by alleging the failure of a condition precedent"). "A condition precedent is a fact (other than the lapse of time) that, unless excused, must exist or occur before a duty of immediate performance of a promise arises." *Gamble v. Corley, Moncus & Ward, P.C.*, 723 So.2d 627, 631 (Ala. 1998). "Ordinarily, failure to comply with conditions precedent … prevents an action by the defaulting party to enforce the contract." *Central Reserve Life Ins. Co. v. Fox*, 869 So.2d 1124, 1127 (Ala. 2003) (citations omitted). With respect to Middlegate's argument, it is certainly correct that "when a contract makes securing financing a condition precedent to its performance, neither the contract nor any of its provisions become binding obligations unless and until financing is obtained." *Ex parte Bill Heard Chevrolet, Inc.*, 927 So.2d 792, 799 (Ala. 2005). The critical question, then, is whether Paragraph 4 establishes the procurement of construction financing as a condition precedent to performance for purposes of the forfeiture clause. "Whether a provision in a contract is a condition precedent depends, not upon formal words, but upon the intent of the parties, to be deduced from the whole instrument." *Fox*, 869 So.2d at 1127 (citations omitted); *see also Bank of Brewton, Inc. v. International Fidelity Ins. Co.*, 827 So.2d 747, 753 (Ala. 2002) ( "[I]n determining whether terms in a contract constitute a condition precedent, we do not look for 'magic' words, but we look to the document as a whole for its intended meaning.").

The fatal flaw in Middlegate's "condition precedent" theory is that the agreement, taken as a whole, does not support a reasonable inference that Paragraph 4 is a condition precedent to performance under the forfeiture clause. As noted, the forfeiture clause in the Fifth Amendment (as well as the earlier amendments, for that matter) provided that all escrowed funds would be forfeited to the Beedes if Middlegate failed to close on the Unit by a date certain. By the plain terms of those amendments, the reason for Middlegate's failure to close is irrelevant for forfeiture purposes. Read together, Paragraph 4 and the amendments reflect that while the parties acknowledged that closing would happen when Casa del Mar obtained construction financing, they placed the risk of that event's non-occurrence squarely on Middlegate by providing that all funds paid into escrow would be forfeited to the Beedes if the closing did not

happen by that deadline.[20]  The Court perceives no reasonable way of reading Paragraph 4 and the Fifth Amendment together to reach a conclusion that Casa Del Mar's procurement of construction financing was a condition precedent to forfeiture of escrowed funds.  Middlegate's legal argument to the contrary is divorced from the actual terms of the agreements, and ignores their clear language.  On this showing, Paragraph 4 does not and cannot constitute a condition precedent to performance under the forfeiture clause.  This determination is reinforced by the Alabama Supreme Court's observation that "[i]t is well-established that condition precedents are not favored in contract law, and will not be upheld unless there is clear language to support them."  *Lemoine*, 62 So.3d at 1025 (citations omitted).  On this record, with this contract language, the Court finds as a matter of law that Middlegate cannot overcome the disfavored status of conditions precedent and cannot show that the parties intended for no forfeiture of escrowed proceeds to occur unless Middlegate failed to close after Casa Del Mar's financing was in place for the contemplated redevelopment project.  Middlegate's highly strained argument amounts to nothing more than wishful thinking.[21]

---

[20]    Moreover, Middlegate's apparent suggestion that the parties intended via Paragraph 4 to provide that closing was never supposed to happen if construction financing was not obtained is irreconcilable with other terms in the same Purchase Agreement.  In particular, Paragraph 8 provided that "[t]he closing will take place on or before June 30, 2005, and no later than the closing of the construction financing by Developer for the redevelopment project." (Doc. 25, Exh. A, ¶ 8.)  Thus, Paragraph 8 set an absolute deadline for closing, irrespective of the status of Casa Del Mar's financing efforts.  By focusing exclusively on Paragraph 4, Middlegate would improperly read Paragraph 8 out of the agreement.  *See, e.g., The Dunes of GP, L.L.C. v. Bradford*, 966 So.2d 924, 927 (Ala. 2007) ("this Court will interpret the terms of a contract to give effect to all terms used") (citations omitted); *Board of Water & Sewer Comm'rs of City of Mobile v. Bill Harbert Const. Co.*, 870 So.2d 699, 710 (Ala. 2003) ("this Court is bound to construe contracts so as to give meaning to all provisions whenever possible").  The only way to harmonize Paragraphs 4 and 8 is the following interpretation: (i) the parties intended for closing to occur when the developer obtained construction financing; (ii) that closing would occur no later than the closing of the developer's financing deal; and (iii) even if Casa Del Mar had not obtained financing, closing would occur by June 30, 2005.  Thus, while the parties intended to use Casa del Mar's financing closing as a guide for the closing of the Unit, they also set a firm closing deadline of June 30, 2005.  Regardless of the status of construction financing, Middlegate was contractually obligated to close on the Unit by June 30, 2005.  As such, Casa Del Mar's financing efforts were not a condition precedent to the closing.  Otherwise, the reference to a June 30, 2005 deadline in Paragraph 8 would be meaningless surplusage.

[21]    Nor does Middlegate advance its cause by proffering an affidavit from one of its principals, opining that "a necessary condition precedent contained in paragraph Number 4 of the (Continued)

-17-

Simply put, then, by the plain terms of the parties' agreement, the escrowed funds were properly forfeited to the Beedes when Middlegate failed to close on the sale of the Unit by the December 31, 2007 deadline set forth in the Fifth Amendment. Middlegate's tort and contract claims assailing the Beedes for accepting and retaining such forfeited funds are therefore devoid of merit. The Beedes' Motion for Summary Judgment is properly **granted** as to all claims asserted against them by Middlegate.

As part and parcel of their Rule 56 Motion on Middlegate's claims, the Beedes request an award of attorney's fees incurred in the defense of such claims. (*See* doc. 28, ¶ 35 ("The Beedes are entitled to summary judgment on each of Middlegate's claims, as well as costs and attorney's fees in the amount of $18,500.00 incurred in having defend [*sic*] said action."). "Alabama follows the American rule, whereby attorney fees may be recovered if they are provided for by statute or by contract …." *Jones v. Regions Bank*, 25 So.3d 427, 441 (Ala. 2009) (citations omitted); *see also Eagerton v. Williams*, 433 So.2d 436, 450 (Ala. 1983) ("In Alabama, attorneys' fees are recoverable only where authorized by statute, when provided in a contract, or by special equity, such as in a proceeding where the efforts of an attorney create a fund out of which fees may be paid."); *Leonard v. Enterprise Rent a Car*, 279 F.3d 967, 973 (11th Cir. 2002) ("Alabama generally applies the American rule, that each party bear its own costs of litigation," subject to "exceptions for statutory and contractual fee shifting"). Here, the Beedes identify neither statute nor contract provision that might permit shifting their attorney's fees to Middlegate. Their conclusory request for a fee award appears untethered to any term of the agreement or provision of law. Accordingly, the Beedes' Motion for Summary Judgment is **denied** insofar as they seek an award of attorney's fees incurred in defending against Middlegate's claims.

---

Purchase Agreement between Middlegate and the Beedes cannot be met." (Stewart Aff. (doc. 30-1), at ¶ 22.) As noted previously, witnesses are generally not permitted to testify to legal conclusions or to apply legal definitions. *See, e.g., Hannah*, 840 So.2d at 852 ("Generally, a witness, whether expert or lay, cannot give an opinion that constitutes a legal conclusion or amounts to the application of a legal definition."). Defendants have properly objected to Stewart's averment on that basis; therefore, their Motions to Strike are **granted** insofar as the Stewart Affidavit sets forth his legal conclusion that Paragraph 4 is a condition precedent to performance under the agreement.

2.    *The Beedes' Counterclaims.*

The Beedes also move for summary judgment on their counterclaims against Middlegate. As pleaded, those counterclaims consist of a claim for "declaratory judgment/specific performance" (in which they seek a judgment imposing specific performance under the contract because Middlegate "demolished said Unit …, leaving the Beedes in a position where they received only a portion of the money due them for the purchase of their Unit, yet were left with no Unit") and a claim for "intentional trespass/conversion" (in which they request compensatory and punitive damages based on Middlegate's "razing of the Beach House Condominium including the Beedes' Unit, without a property interest sufficient to do so and without the permission of the Beedes"). (Doc. 14, ¶¶ 57-61.)

As demonstrated by the foregoing, the theory animating all of these counterclaims is that Middlegate destroyed the Beedes' Unit without first buying it. The centrality of this factual allegation to those counterclaims defeats the Beedes' Rule 56 Motion. Simply put, the record is devoid of any information as to the present status of the Unit. To be sure, the Beedes have alleged that "Middlegate has already razed Unit A-206 at the Beach House Condominium" (doc. 28, at 15); however, the Beedes' only citation for the fact is to "Beede Answer and Counterclaim." (*Id.* at 16.)[22] That is not sufficient to satisfy the Beedes' threshold burden under Rule 56 of the Federal Rules of Civil Procedure. As summary judgment movants, the Beedes must support their assertions of undisputed fact by reference not to pleadings, but to specific materials in the record. *See* Rule 56(c)(1)(A), Fed.R.Civ.P. (party asserting that a fact is not genuinely disputed "must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers or other materials"); LR 7.2(a) (suggested determinations of undisputed fact must contain "findings of fact appropriately referenced to the supporting document or documents filed in the action or in support of the motion"). A party's mere say-so is simply not good enough to establish a right to summary

---

[22]    In the pleadings, Middlegate expressly denied the Beedes' factual allegation that it had razed or otherwise destroyed their Unit. (Doc. 22, ¶¶ 59, 61 (affirmatively alleging that the Beedes' unit "was destroyed by Hurricane Ivan," not by Middlegate).)

judgment.[23]  And an unverified pleading, whose contents have been expressly denied by the opposing party, is likewise insufficient.[24]

On this record, the Court is presented with no facts that might establish whether the Beedes' Unit was destroyed at all, much less whether the cause of any such destruction was Middlegate (as opposed to Hurricane Ivan, Casa Del Mar, or some third party).  Nor are there record facts setting forth the circumstances of such destruction, and whether the building was razed with the Beedes' consent.  The Court cannot tell whether the Beedes' Unit is still standing and, if not, who or what destroyed it and under what circumstances.  In short, the undersigned is left guessing as to the crucial facts underpinning the Beedes' counterclaims.  The Beedes' evidentiary showing is wholly inadequate to satisfy their initial burden under Rule 56.  Absent record evidence showing undisputed facts that Middlegate destroyed the Unit and did so without consent or permission, the Beedes are not entitled to entry of summary judgment on their counterclaims of declaratory judgment / specific performance and intentional trespass / conversion.[25]  Accordingly, the Beedes' Motion for Summary Judgment (doc. 28) is **denied** as to the Counterclaims.

---

[23]      *See, e.g., Ellis*, 432 F.3d at 1326 ("mere conclusions and unsupported factual allegations are legally insufficient" on summary judgment); *Mullins v. Crowell*, 228 F.3d 1305, 1303 (11th Cir. 2000) (summary judgment movant's initial burden is satisfied not by amorphous speculation or even emphatic say-so, but "by reference to materials on file"); *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210 (11th Cir. 2000) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.") (citation omitted); *Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence.").

[24]      *See, e.g., Holloman v. Jacksonville Housing Authority*, 2007 WL 245555, *2 (11th Cir. Jan. 30, 2007) ("unsworn statements … should not be considered in determining the propriety of summary judgment"); *Mosley v. MeriStar Management Co.*, 2005 WL 1489320, *3 n.3 (11th Cir. June 23, 2005) ("the complaint was unverified and therefore could not be considered evidence supporting [plaintiff]'s claim" on summary judgment); *Burden v. International Longshoremen's Ass'n, Local No. 1410*, 510 F. Supp.2d 618, 628 n.9 (S.D. Ala. Apr. 30, 2007) (an "assertion in the unverified amended complaint … is not evidence for purposes of a motion for summary judgment").

[25]      Additionally, the Beedes' own construction of the agreement, as set forth in their principal summary judgment brief, casts considerable doubt on their right to specific performance.  After pointing out that Middlegate did not make the required monthly payments (Continued)

**V.     Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.      The Motions to Strike (doc. 32, 35) are **granted** as to all portions of the Affidavit of Paul Stewart (doc. 30-1) in which he purports to testify about facts outside his personal knowledge (including conversations between Middlegate and Central Illinois in which he did not participate) and to offer legal conclusions masquerading as facts (including his statements that Central Illinois breached fiduciary duties and wrongfully refused to return funds, and that Paragraph 4 of the Purchase Agreement was a condition precedent).  Those aspects of the Stewart Affidavit are **stricken** pursuant to Rule 56(c)(4), Fed.R.Civ.P.

2.      Defendant Central Illinois Title Company's Motion for Summary Judgment (doc. 25) is **granted**, and all claims against it are **dismissed with prejudice**.  The Clerk's Office is directed to terminate Central Illinois as a party.

3.      Defendants/counterclaim plaintiffs Howard and Nancy Beede's Motion for Summary Judgment (doc. 28) is **granted in part**, and **denied in part**.  The Motion is **granted** as to all claims asserted against the Beedes by Middlegate, and those claims are **dismissed with prejudice**.  The Motion is **denied** as to the Beedes' request for attorneys' fees.  The Motion is further **denied** as to the Beedes' Counterclaims.

4.      This action will proceed as to the Beedes' Counterclaims against Middlegate.[26]

---

during 2007, did not make the final payment on December 31, 2007, and did not close on December 31, 2007, the Beedes argue as follows:  "the unambiguous terms of the agreement state that all monies paid shall be forfeited to the Beedes *and the purchase agreement including all addendums shall be null and void*."  (Doc. 28, ¶ 17 (emphasis added).)  If, by the Beedes' own reckoning, the purchase agreement and its addenda became "null and void" when Middlegate failed to close in December 2007, how then can they be entitled to specific performance of that "null and void" agreement in this lawsuit?  This key question remains unanswered.  The apparent inconsistency in the Beedes' legal position provides an independent reason for denying their request for summary judgment as to the specific performance claim.

[26]      Defendants filed for summary judgment early in the lifespan of this litigation; indeed, the applicable Rule 16(b) Scheduling Order (doc. 21) provides that the deadline for dispositive motions is September 30, 2011.  The Beedes should not take this deadline as an invitation to renew their Rule 56 motion at that time.  Having elected to consume substantial (Continued)

DONE and ORDERED this 9th day of August, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

judicial and litigant resources early in the game by filing their Motion for Summary Judgment near the inception of this case, the Beedes will not be afforded a second bite at the summary judgment apple to raise arguments and present evidence that they could and should have submitted earlier, but did not. To proceed otherwise would be to allow litigants to treat their initial summary judgment motions as a "dry run" which they would have an opportunity to redo or supplement – at considerable additional cost to opposing parties and at a considerable drain to scarce judicial resources – via a new Rule 56 motion later on to correct any deficiencies identified by opposing counsel or the court in processing the initial motion. *See generally Allstate Finance Corp. v. Zimmerman*, 296 F.2d 797, 799 (5th Cir. 1961) ("we certainly do not approve in general the piecemeal consideration of successive motions for summary judgment, since defendants might well normally be held to the requirement that they present their strongest case for summary judgment when the matter is first raised"); *Sanders v. York*, 2008 WL 1925232, *4 (E.D. Cal. Apr. 30, 2008) ("The court will not allow defendants another 'bite at the apple' to file a second summary judgment motion addressing the merits of the remaining claims … as it would waste court resources and delay resolution of this action."); *McCabe v. Bailey*, 2008 WL 1818527, *1 (N.D. Iowa Apr. 4, 2008) (enforcing "one-summary-judgment-motion-per-party" rule "to conserve scarce judicial resources, prevent repetitive motions and forestall potential abuse"); *United States v. Fisherman's Fleet, Inc.*, 2008 WL 687028, *1 (D. Mass. Mar. 12, 2008) (denying leave to file second motion for summary motion where movants "had a full opportunity on their first motion to advance any and all reasons why the action should be considered barred" and "[t]here is no reason to allow serial motions"); *Impreglon, Inc. v. Newco Enterprises, Inc.*, 508 F. Supp.2d 1222, 1225 n.1 (N.D. Ga. 2007) ("This Court has discretion to require parties to present their arguments in a single motion for summary judgment."); *Divane v. Krull Elec. Co.*, 2002 WL 31844987, *1 (N.D. Ill. Dec. 18, 2002) (denying request for successive motion for summary judgment in absence of "good reasons," and explaining that "[t]his court has neither the time nor the inclination to consider arguments one at a time in serial motions, to suit a litigant's convenience"); *Doherty v. Portland Community College*, 2000 WL 33022560, *3 (D. Or. Nov. 15, 2000) ("much of the value of summary judgment would be lost if parties were to successively raise new theories," which "would unduly prejudice [nonmovant] and unfairly give to [movant] the proverbial second bite at the apple"). Accordingly, the Court will consider a subsequent motion for summary judgment from the Beedes only if it comports with the standards for reconsideration under Rules 59 and 60 of the Federal Rules of Civil Procedure, or if the Beedes demonstrate that they are raising new, previously unavailable arguments and/or presenting new, previously unavailable evidence in support of their claims.